In the Matter of the Application of AH HIN on behalf of MAN NUN and AH YIN, for a Writ of Habeas Corpus.

On Appeal from Chief Justice Judd.

October Term, 1888.

Judd, C.J., McCully, Preston, Bickerton and Dole, JJ.

Two Chinamen arrived at the port of Honolulu in the S. S. Australia, having return passports not issued to them by the Foreign Office but purchased by them in Hongkong:

The Master of the Australia made return to the Writ that he held the men in custody by virtue of an order from the Collector-General, and that he did not know the cause of such restraint and did not hold them by virtue of any process or warrant:

The Statute of 20th December, 1887, "To Regulate Chinese Immigration," prescribes that "From and after the 1st day of March, A.D. 1888, no vessel coming from ports beyond the Hawaiian Islands shall be allowed to land Chinese at any port in this Kingdom, unless said Chinese are provided with permits to enter the Kingdom," etc., etc:

After notification, the Attorney-General filed a supplementary return, wherein he averred that the appellants are legally detained, being Chinese within the meaning of the Statute above quoted:

Held, the appellants were legally detained in custody, their landing on these shores being prohibited:

The Statute prohibiting their landing and imposing a penalty upon Masters of vessels for landing them, is sufficient authority or *due process of law* justifying their detention:

The vessel bringing them to this port having departed pending this appeal, the appellants were ordered to the custody of the Marshal to be returned by him to the Master of the vessel on his arrival, for deportation out of the Kingdom.

OPINION OF THE COURT BY PRESTON, J.    (DOLE, J. DISSENTING.)

This is an appeal from a decision of the Chief Justice, ordering that Man Nun and Ah Yin, two Chinese on behalf of whom an application for a writ of habeas corpus had been made, be remanded to the custody of the Marshal until the steamship Australia should be again in port.

From this decision an appeal was taken.

The circumstances under which the matter came before the Chief Justice are as follows :

On the 20th December, 1887, a law was passed to come into effect on the first day of March, 1888, " to regulate Chinese immigration."

Sections 2 and 3 of the law read as follows :

"Section 2.    From and after the 1st day of March, A.D. 1888, no vessel coming from parts beyond the Hawaiian Islands shall be allowed to land Chinese at any port in this Kingdom, unless said Chinese are provided with permits to enter the Kingdom, granted, signed and sealed by the Minister of Foreign Affairs of the Hawaiian Kingdom, under and subject to regulations to be prepared and published by him, by and with the consent of the Cabinet in Council, except as hereinafter provided, and excepting all Chinese to whom or for whom permission to enter the Kingdom has heretofore been granted, as shall be shown by the records of the office of the Minister of Foreign Affairs."

"Section 3.    If any master of a vessel shall land or attempt to land any Chinese without such permit as aforesaid, he shall be liable on conviction to a penalty of two hundred dollars for each Chinese unlawfully landed or attempted to be landed, and such passenger landed or attempting to land shall be liable on conviction to a penalty of fifty dollars ; and the master of such vessel shall be compelled to re-embark such Chinese as may have unlawfully landed, and upon his neglect or refusal so to

do, after notification by the Minister of Foreign Affairs, he shall be liable on conviction to a penalty of two hundred dollars or to imprisonment for a term not exceeding thirty days."

On the 24th day of July last, the steamship Australia arrived in the port of Honolulu, the appellants being passengers: The appellant, Man Nun, having a passport or permit in the following terms:

"No. 782 B.

PASSPORT, Issued under the regulations of March 25th, 1884, controlling the immigration of Chinese into the Hawaiian Kingdom.

FOREIGN OFFICE, HONOLULU, }
MAY 25, 1885.              }

Permission is hereby granted to Goon Sung, lately residing at Hakalau, Hilo, on the Island of Hawaii, to enter the ports of this Kingdom on his return from China.

J. S. WEBB, Secretary.

This passport must be delivered up to the Customs authorities by the holder on arrival at any port of this Kingdom."

On the back is the following endorsement with the seal of the Hawaiian Consulate affixed:

"Vise, Hong Kong, 10th June, 1888, for J. Bell Irving, Hawaiian Consul-General."

The appellant, Ah Yin, had a similar passport, granted to "Achong."

The Customs authorities prevented the appellants from landing, and so notified the Master of the Australia.

On the 30th of July, Ah Hin petitioned the Chief Justice, on behalf of the appellants, for a writ of habeas corpus, alleging, inter alia:

"That the said Man Nun and Ah Yin are unlawfully and unjustly restrained of their liberty by H. C. Houdlette, master of the Hawaiian steam vessel Australia, on board of said steam vessel.

"That petitioner is informed and believes, and upon such information and belief avers, that the pretended cause of such

restraint is, that the said Man Nun and Ah Yin had presented passports or permits for entering this Kingdom, which had been used before their presentation of the same.

" That petitioner is informed and believes that said Man Nun and Ah Yin are not restrained by virtue of any warrant or other process."

The Chief Justice issued the writ and appointed the next day (31st July) at 9 :30 a. m. for the hearing.

The appellants were produced in Court, and a return prepared by their counsel was filed by Captain Houdlette, " that he has the within named Man Nun and Ah Yin in his custody by virtue of an order of the Collector-General of the port of Honolulu, who has ordered respondent to hold them ; that respondent does not know the cause of such restraint and does not hold them under any process or warrant."

The Chief Justice ordered the Attorney-General to be notified, who appeared and filed a supplementary return, wherein he averred that the appellants were legally detained by Captain Houdlette, " for the reasons that the said Man Nun and Ah Yin are Chinese within the meaning of Chapter XXVIII. of the laws of 1887 (hereinbefore referred to). That said Man Nun and Ah Yin arrived at the port of Honolulu from a foreign port, to wit, the port of San Francisco, in the State of California, on board the steamer Australia. That said Man Nun and Ah Yin were not upon their said arrival, and are not now, provided with any legal permit or other sufficient authority to enter this Kingdom, as provided by said Chapter XXVIII., and that said detention, as complained of by petitioner, was and is owing to the refusal of the Customs officer of the Hawaiian Government to permit said respondent to land said Man Nun and Ah Yin upon Hawaiian soil."

As the Australia was to sail at noon, the Court, with the concurrence of counsel, adjourned the hearing until the 3d August, and admitted the appellants to bail in the sum of $500 each.

At the hearing it appeared from the evidence of Man Nun, that neither he or Ah Yin had previously been in this Kingdom,

and that they purchased the said passports from some China man in the office of the Hawaiian Consul at Hongkong for the sum of $28 each.

The Chief Justice allowed the sufficiency of the supplementary return made by the Attorney-General, and remanded the appellants to the custody of the Marshal until the return of the Australia.

₀ An appeal was taken, and with the consent of the Attorney-General the appellants were admitted to bail.

## BY THE COURT.

By the law in question it appears to us the Legislature has clearly expressed its intention to prohibit the landing of Chinese in the Kingdom, except in the cases specially provided for.

It is contended that the appellants were detained in custody without warrant or due process of law.

The statute provides that "The Collector-General or any Collector of Customs shall have the authority to detain any person detected in or reasonably suspected of a violation of any of the provisions of this Act, and to hold him until a warrant of arrest can be obtained;" and it is urged that the Collector-General had no authority to order the detention of the appellants, except for a time necessary to procure a warrant for their arrest.

But neither the Collector-General or the Government is bound to proceed against persons arriving in vessels in the manner of these appellants. They may take such steps as may be necessary to prevent such persons landing. Otherwise the whole scope and intent of the law might be defeated, by the authorities taking such persons from the vessel and charging them with attempting to land, for which a penalty of fifty dollars could be inflicted. The enforcement of such a fine would not deter the landing of such prohibited persons.

It may be conceded that the return made by Captain Houdlette is, in itself, not sufficient to justify the detention of the

appellants. But we must look at the circumstances under which such return was made.

The application for the writ was made on the eve of the departure of the vessel.

We can well understand that the Captain would be desirous of relieving himself from the necessity of taking the appellants back, and would be glad of the chance of having the appellants released under the writ. The return was prepared by the appellants' counsel, and expressly states that the appellants were held without any process or warrant.

To allow the discharge of the appellants under such circumstances would render the process of this Court a means for enabling masters of vessels to evade the provisions of the law with impunity.

The supplementary return made by the Attorney-General puts the whole matter in issue, and we have to decide whether the facts stated in such return are a sufficient justification for the detention of the appellants, and whether at the time of the issuing of the writ they were detained under due process of law.

What is meant by authority, or due process of law? For answer we may refer to Hurd on *Habeas Corpus*, p. 401, and Church on *Habeas Corpus*, Section 160, and the authorities there cited.

From these authorities, commencing with Lord Coke, it appears that due process of law comprehends any authority, lawful warrant or proceeding, under which a person may be arrested, and a proceeding and warrant, either in deed or in law, without warrant.

The Legislature, in exercise of its undoubted right, has thought fit to prohibit the landing of Chinese in this Kingdom, except in certain cases, which do not apply to these appellants. And it is the duty of this Court to give effect to this legislation without considering its policy or wisdom.

We cannot conceive of any higher warrant or authority in law, than the express enactment of the Legislature within its constitutional limits, forbidding the landing of Chinese without

permits, and we are bound to hold that the Government had, by its officers, full authority to prevent the landing of prohibited persons upon the shores of this Kingdom, and in furtherance of such authority to notify and direct the masters of vessels, arriving with such persons on board, to detain and prevent them from landing. The law having imposed penalties upon the masters of vessels for landing such persons, it becomes their duty to detain them on board, and such detention is, in our opinion, by due warrant and process of law.

We therefore dismiss the appeal and order the appellants to be remanded to the custody of the Marshal, as directed by the Chief Justice.

*Paul Neumann*, for appellants.

*C. W. Ashford* (Attorney-General), for the Crown.

---

### DISSENTING OPINION BY MR. JUSTICE DOLE.

It appears from the records in this case, that on the return day of the writ, July 31st, H. C. Houdlette, the respondent, the appellants, their counsel, and the Attorney-General, were present in Court. The respondent filed his return to the writ, and the Attorney-General filed a document entitled, "Supplementary Return by the Attorney-General," and prefaced by the following paragraph : "And now comes C. W. Ashford, Attorney-General of the Kingdom, and on behalf of the Hawaiian Government, by the leave of the Court, makes this return supplementary to that made herein by H. C. Houdlette, the respondent named in said writ." From this it is clear that the Attorney-General intervened in the case in his official capacity. By Section 19 of the *Habeas Corpus* Act, he is authorized to do so only when the petitioners are imprisoned on a criminal accusation, which is not the fact in this case. Section 18, which allows third parties interested in the detention to be heard, evidently does not intend to include the Government, it being provided for by Section 19, already referred to. I am able to concede, however, that a fair argument may be made upon the wording of Section 18, in favor of the right of the Government to be heard. But if

the Attorney-General is properly in Court, he is not authorized thereby to file a return, he is merely there, at most, to be heard, and possibly to put in evidence. The statute is explicit upon this point. The person to whom the writ is directed shall make the return and it shall be signed by him, and sworn to, unless he is a sworn public officer, making the return in his official capacity, which can only mean a public officer to whom a writ of *habeas corpus* is directed; moreover, the Attorney-General's return is neither signed nor sworn to; it therefore seems proper to leave it out of the consideration of the case altogether.

The return by Captain Houdlette was explicit according to the requirements of the statute, which are that a person to whom the writ is directed shall state first, whether he has or has not the party mentioned in the writ in his custody; second, if he has, he shall set forth the authority, the time and the cause of the imprisonment, with a copy of any process or warrant under which the party is detained. The return states, "that he has the within named Man Nun and Ah Yin in his custody, by virtue of an order of the Collector-General of the port of Honolulu, who has ordered respondent to hold them; that respondent does not know the cause of such restraint and does not hold them under any process or warrant." This return, upon being filed, became evidence in the case, by the provisions of the statute. Testimony was taken by the Court, which in no wise rebutted the return, nor was in any way responsive to it. The gist of the evidence was, that the prisoners had never been in the Hawaiian Islands before, that they had purchased permits at the Hawaiian Consulate in Hongkong, which had been originally issued to other Chinamen, and that these permits had been *vised* by the Hawaiian Consuls at Hongkong, and San Francisco.

The question which must decide this case is, was the imprisonment by Captain Houdlette of the prisoners, on board the steamer Australia, legal? If the proper answer to this question is an affirmative one, the order appealed from must be sustained; if a negative one, the appellants are entitled to be discharged. (Hurd on *Habeas Corpus*, 293.)

I agree with the majority of the Court, that the Hawaiian Legislature has the right to enact laws, not inconsistent with our treaties, prohibiting foreigners from entering the country; but the mere enactment of a prohibition does not authorize any one, or even any officer of Government, to carry it into effect. Personal liberty is a matter of great and sacred importance, and the law will not tolerate interference with it by volunteers, however zealous and patriotic their motives may be. It is guarded by constitutional and statutory enactments which are the reflection and the fruit of centuries of struggle. It may only be infringed "by due process of law." A person may be restrained of his liberty by legal process under a criminal accusation, for the purpose of the trial of such accusation, and he may be imprisoned by legal process, upon conviction of a criminal offense, as the authorized punishment thereof, but nowhere is it allowed that one should be restrained of his liberty without process of law, or imprisoned as a punishment for an offense without due trial and conviction of such offense.

The following are some of the enactments of our Government for the protection of the right of personal liberty :

"Each member of society has a right to be protected in the enjoyment of his life, liberty and property according to law." (Constitution, Article 14.)

"No person shall    *    *    *    be deprived of life, liberty or property without due process of law." (Constitution, Article 9.)

"No person shall be subject to punishment for any offense, except on due and legal conviction thereof, in a court having jurisdiction of the case." (Constitution, Article 6.)

"No person shall be held to answer for any crime or offense (except in cases of impeachment, or for offenses within the jurisdiction of a Police or District Justice, or in summary proceedings for contempt), unless upon indictment fully and plainly describing such crime or offense ; and he shall have the right to meet the witnesses who are produced against him face to face; to produce witnesses and proofs in his own favor, and by himself or his counsel at his election to examine the witnesses produced

by himself, and cross-examine those produced against him, and to be fully heard in his own defense." (Constitution, Article 7.)

" No arrest of any person shall be made without first obtaining a warrant or other process therefor from some magistrate, except in the cases in this chapter hereinafter provided." (Penal Code, Chapter XLIX., Section 1.) The following are the exceptions to this rule: 1. Where one has committed an offense and shall endeavor to escape, he may be arrested under a verbal order of a magistrate, or without such order if no magistrate be present. 2. One in the act of committing a crime may be arrested by anyone without warrant. 3. When a crime has been committed, persons near the place under suspicious circumstances may be arrested without warrant. 4. Officers of justice in a seaport or town may arrest persons without warrant upon a reasonable suspicion that they have committed or intend to commit an offense. 5. Officers of the police or customs may without warrant arrest persons charged with or suspected of smuggling. 6. Any collector of customs has the authority under Section 10 of the Act of 1887 to Regulate Chinese Immigration, " to detain any person detected in or reasonably suspected of a violation of any of the provisions of this Act, and to hold him until a warrant of arrest can be obtained."

The appellants were at the time of their detention as fully entitled to the protection of these enactments as any other persons within the Kingdom, inasmuch as by coming within Hawaiian jurisdiction their persons and property became subject to our laws. (Civil Code, Section 6.)

" The privilege of *habeas corpus* belongs to all men." (Constitution, Article 5.)

The respondent, not an officer of the Government, deprived the appellants of their liberty under an order of the Collector-General, which order made no criminal charge against them, as we learn from the return, in which the respondent says he " does not know the cause of such restraint;" so far as the Court is informed, it was merely an arbitrary order to the respondent to

detain the men without giving any reasons therefor. The Collector-General is authorized by law to arrest without warrant persons charged with or suspected of smuggling, for purposes of examination by the Court having jurisdiction thereof. (Civil Code, Section 656.) He is also authorized by the Act to Regulate Chinese Immigration, of 1887, Section 10: "To detain any person detected in or reasonably suspected of a violation of any of the provisions of this Act, and to hold him until a warrant of arrest can be obtained." Beyond these powers of restraint, the law gives him no authority to interfere with the liberty of any person. It is not pretended that the appellants were detained by the Collector-General under the provisions of Section 10 of the Chinese Immigration Act above quoted, nor is it pretended that they had been tried and found guilty of unlawfully landing or attempting to land under the provisions of the said Act, but the decree appealed from finds "that they were rightfully restrained on board said steamship by H. C. Houdlette, the master thereof, because of the rightful refusal of the Customs officers of said port to permit said Man Nun and Ah Yin to land or be landed upon Hawaiian shores," upon the ground of their being Chinese without permits. The brief of the Attorney-General does not discuss the important question of the legality of the detention further than to say "that it is incident to the statutory prohibition" against the landing of Chinese, and to refer to the cases of *Chin Ah Sooey*, 3 West Coast Rep., 603, and *Ah Kee*, 4 *Id.*, 19, under the American Act of 1882, restricting the immigration of Chinese laborers. Upon examining these cases, I find that in both of them the issue was not whether the detention was lawful, but whether upon finding that the detention was lawful, the Court had the authority to order the deportation of the prisoner.

I find, however, from these and other American cases, that the American Courts recognize a detention by the collector of the port or by a shipmaster under his direction under the various statutes restricting immigration, to be lawful. These statutes are the Act restricting the immigration of Chinese laborers, of

May 6, 1882; the Act to regulate immigration of August 3, 1882, whereby provision was made to prevent the landing of foreign convicts, lunatics, idiots and paupers; and the Act of February 26, 1885, whereby provision was made to prevent the landing of immigrants under a contract to labor in the United States. Section 9 of the said Act of May 6th is as follows : " That before any Chinese passengers are landed from any such vessel, the collector or his deputy shall proceed to examine such passengers, comparing the certificates with the list (of Chinese passengers) and with the passengers; and no passenger shall be allowed to land in the United States from such vessel in violation of law ; " the violation of law being the want of a proper certificate. Section 2 of the said Act of August 3d provides for the appointment and authorization of Commissioners of Immigration for the different States, whose duty it shall be " to examine into the condition of passengers arriving at the ports within such State in any ship or vessel; and if on such examination there shall be found among such passengers any convict, lunatic, idiot or any person unable to take care of himself or herself without becoming a public charge, they shall report the same in writing to the collector of such port, and such persons shall not be permitted to land." I have not been able to refer to the said Act of the 26th February, 1885, but it is clear from the case of *Cummins* in 32 Federal Rep., 76, which says : " There was before the collector, when he made his decision, legal and competent evidence of facts on which to exercise a judgment as to the status of the relator. Under these circumstances, the matter being within the jurisdiction of the collector under the Act, further consideration of the case might be dispensed with under the authority of *In Re Day*, 27 Federal Rep., 678 ; " that the collector is by the Act specially authorized to examine into and decide the question of the right of a passenger to land. It will be seen, therefore, that each of these three American statutes, enacted for the purpose of restricting immigration, provides an authority—a tribunal—to examine into the case of passengers coming into port from a foreign country,

30

before they are allowed to come ashore, to ascertain and decide whether they are entitled to land; and if such a conclusion is against the right of a passenger to land, the law authorizes the collector to detain him on board. Under these provisions of law, it is a matter of course that the American Courts, in *habeas corpus* cases, should find that such detention is legal, simply because it is upon a finding of fact by duly authorized tribunals, and made by collectors authorized by law to act upon such findings of tact.

The Hawaiian Act to Regulate Chinese Immigration, of 1887, on the other hand, contains no provisions whatever for the detention of Chinese passengers on board a vessel arriving from foreign ports, until their right to enter the country shall be ascertained; it does not confer upon any persons or officers whatever the authority to decide the question of the right of Chinese to land, except under Section 11, in which jurisdiction is conferred upon Police and District Justices to determine certain offenses under the Act, including that of landing or attempting to land without the proper permit. The Collector-General is given no authority to adjudicate the question of the right of Chinese passengers to enter the country or to detain them on board their vessel for want of such right. His absence of authority in the premises is emphasized by the fact that the Legislature found it necessary, by the express provisions of Section 10, to confer on him " the authority to detain any person detected in or reasonably suspected of a violation of any of the provisions of this Act, and to hold him until a warrant of arrest can be obtained." If the collector had the general authority to detain indefinitely a passenger, it would not have been necessary to give him by statutory enactment the lesser authority to detain him an hour or two until a warrant of arrest could be procured. The two legal maxims—*Expressio unius est exclusio alterius* and *Expressum facit cessare tacitum*—apply to the discussion at this point, and dispose of the argument for an implied general authority in the Collector-General to detain passengers under the Act.

Because the statute has prohibited certain persons from entering the country, is anyone thereby authorized to take it upon himself to carry out the statute as a volunteer, and under the mere act of prohibition to deprive individuals of their personal freedom ? And if one acting under such a naked prohibition arrests an individual, can such an arrest be said to be under legal process ? I am compelled to answer both of these questions in the negative, and so far to dissent from the opinion of the majority of the Court. An illustration may make this point more clear. Polygamy is prohibited by statute and a penalty provided for it. No one would, however, be thereby authorized to arrest a person of his own motion, and deprive him of his liberty to prevent him from transgressing the statute. The Legislature has relied upon the penalty as a prevention of polygamy, and no one may use deprivation of liberty as a prevention simply, because such a course is not authorized by the statute. The Legislature in the Act to Restrict Chinese Immigration relied upon the penalty as a prevention; it is not for the Court to say that the penalty is insufficient, and therefore measures not provided in the statute, even to the extent of deprivation of liberty, may be used to give it effect. I think that this would be open to the charge of judicial legislation.

From my examination of our law and of cases in other countries, I am compelled to find that the detention of these prisoners was illegal and without process of law. Chancellor Kent says : " The better and larger definition of *due process* of law is, that it means law in its regular course of administration through courts of justice." (2 Com., 13.) " Lord Coke says that these latter words, *per legem terræ* (by the law of the land) mean by due process of law, that is, without due presentment or indictment, and being brought to answer thereto by due process of the common law." (3 Story Com., 661 ; 2 Inst., 50, 51.) " The full significance of the clause 'law of the land' is said by Ruffin, C. J., to be that statutes which would deprive a citizen of the rights of person and property without a regular trial according to the course and usage of the common law, would not

be the law of the land." (4 Dev. N. C., 15; 2 Bouv., 512.) "Such legislative Acts as profess in themselves directly to punish persons, or to deprive the citizen of his property, without trial before the judicial tribunals, and a decision upon the matter of right as determined by the laws under which it vested according to the course, mode and usage of the common law as derived from our forefathers, are not effectually the laws of the land for these purposes." (4 Dev. N. C., 15, *Coke vs. Harrison.*)

The prisoners were detained by persons who had no authority to do so; they were not charged with an offense and held to trial therefor, nor were they imprisoned as punishment under conviction of an offense after trial by a court having jurisdiction thereof; they were therefore entitled to their discharge. " One who detains another by written authority can return only that authority; and if it be insufficient, we believe the general practice and law now to be that the prisoner is, as to that special commitment, entitled to his discharge. (Church on *Habeas Corpus*, 162.) " If it should appear manifest on an examination of those proceedings by the Court that the Court of Chancery (the committing court) has exceeded its authority, and that Mr. Yates is illegally imprisoned, I would ask, whence is the necessity of any further investigation into what has been called the merits of the present case." (*Yates vs. People*, 6 Johns., 269.) " A return that a prisoner is detained in custody being charged upon oath with being a deserter from the Royal Leinster Regiment, held insufficient; it ought to have appeared that he was committed by some person having authority to commit." (*King vs. Earl Mountmorris, Reid et al.*, 1 Ridg., 460. Church on *Habeas Corpus*, 200.) " For if the commitment be against law, as being made by one who had no jurisdiction of the cause * * * the Court are to discharge him." (*Ibid*, 208, 328, 347.) " An arrest made by an officer beyond the limits of his authority is void." (*Ibid*, 348, *Lawson vs. Buzines*, 3 Har., Del., 418; Impey's Shff., 552; Hale P. C., 584; Skin., 674, pl. 2, 12 Co., 130; Wilmot's Opinions, 106; Hurd on *Habeas Corpus*, 331.)

Even the majority of the Court concede that the return made by the respondent is in itself not sufficient to justify the detention of the prisoners; whence, then, to quote again from *Yates vs. People*, was the necessity of any further investigation into the merits?

I find, however, under English and American authorities, that the Court in *habeas corpus* proceedings where the detention is found to be illegal, will sometimes, where it is probable from the evidence that an offense has been committed, recommit the prisoner to the proper court for trial. (Church, 367, 372, 373; *Rex vs. Marks*, 3 East, 157; *People ex rel. Walters vs. Connor*, 15 Abb. Pr. N. S., 430; *Ex Parte Ricord*, 11 Nev., 287.) I am inclined to think that in the present case the Court had the power to commit the prisoners to the Police Court for trial for unlawfully attempting to land under Section 11 of the Statute; it is clear to me that such a course was the only alternative from granting a discharge.

The counsel for the prisoners made the further point, that as the permits held by them were *vised* by the Hawaiian Consuls at Hongkong and San Francisco, the Hawaiian Government was thereby bound to recognize such permits as sufficient to admit the prisoners. The passports or permits were issued under the Foreign Office Regulations of March 25, 1884. These Regulations authorized the Foreign Office to issue passports "to any Chinese resident in this Kingdom who may desire to visit any foreign country and return therefrom." No provision was made in the regulations for the *vise* of these passports by Hawaiian Consuls or anyone. The Regulations of September 1, 1885, first introduced the requirement that Chinese passports should be *vised*, and such requirements applied only to the passports issued under such new regulations. From these circumstances, it is clear that the Consuls, in *viseing* these passports, acted without authority from the Hawaiian Government, and that their action was wholly immaterial as affecting the validity of the passports. I am, therefore, of the opinion that if this Court had the right to entertain this question, which I doubt, they

could only hold that the Hawaiian Government was not in anywise bound or affected by the action of its Consuls in the premises.